***NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| ADONIS D. THOMAS, | : | Civil Action No. 12-2047 (JLL) |
| Petitioner, | : | |
| v. | : | **OPINION** |
| CHARLES WARREN, et al., | : | |
| Respondents. | : | |

**LINARES**, District Judge:

Presently before the Court is the amended petition for a writ of habeas corpus of Adonis Thomas ("Petitioner") brought pursuant to 28 U.S.C. § 2254 challenging his state court conviction (ECF No. 35), to which Respondents filed a response (ECF No. 41), and to which Petitioner has filed a reply and a traverse. (ECF No. 42, 45). For the following reasons, the Court will deny the petition and no certificate of appealability shall issue.

## I. BACKGROUND

In June of 1998, Petitioner, Adonis Thomas, was tried and convicted of two counts of first degree murder, one count of first degree attempted murder, one count of second degree aggravated assault, one count of third degree burglary, one count of third degree unlawful possession of a weapon, and one count of second degree possession of a weapon for an unlawful purpose. (January 2001 Appellate Division Opinion, Document 7 attached to ECF No. 13 at 1-2). As a result of his convictions, Petitioner was sentenced to three consecutive life terms, one for each murder and attempted murder charge, with a thirty year period of parole ineligibility for each of

two murder charges and a further twenty-five year period of ineligibility for the attempted murder charge totaling eighty five years of parole ineligibility. (*Id.* at 2). Petitioner received sentences on the remaining charges which ran concurrent with these life sentences. (*Id.*).

On direct appeal, the New Jersey Superior Court – Appellate Division summarized the underlying facts as follows:

> [Petitioner]'s convictions rest upon an incident that occurred in the early morning hours of September 14, 1997. At approximately 11 p.m. on September 13, 1997, Hassan Carter, David Hodge and Derek Smith, in Carter's red Honda Civic, drove to attend a birthday for a friend that was being held at a nightclub in Newark known as Shadows. Carter parked his car a short distance from the club in front of 123 South 12th Street. He removed the car's radio and hid it under the driver's seat. He also installed an anti-theft club device to lock the steering wheel. He then locked the car and the three young men proceeded to the party. They left at approximately 2:00 a.m. When they walked back to Carter's car, they saw the parking lights were on, as well as the interior lights. Carter ran up to the car and saw that it had been broken into. A window was broken, the radio was missing and the club had been removed.
>
> The three men got into the car, Smith into the rear passenger seat. Carter started up the car and saw a man sitting on the porch of 123 South 12th Street. The man, later identified as Lonnie [McNiel[1]], had been there when the three arrived several hours earlier. Carter pulled the car up and stepped out. He asked [McNiel] if he knew who broke into his car but [McNiel] said he didn't know. Carter began to argue with [him], insisting he must have seen something since he had been sitting there the whole time.
>
> Smith looked and saw another man walking toward them alongside 123 South 12th Street. Smith and Hodge both saw that the man had a gun and they yelled to Carter. Smith jumped out of

[1] The original Appellate Division opinion refers to this witness as Lonnie "McDaniel." *Id.* at 3-4. He was identified in the trial transcripts as McNiel and referred to as such throughout most of Petitioner's proceedings. As such, this opinion refers to this witness generally by that name, although evidence presented during the PCR Petitioner's PCR proceedings indicated that his name was actually Lonnie Neal.

> the rear seat and fled down the street toward the nightclub, where he knew there were several police officers. He heard gun shots as he ran. At the nightclub, he told the officers what had happened. They, in turn, ran up the street. When they arrived, they found Carter and Hodge, both lying in the street, shot to death. Police Officer Peppers noted that some bystanders mentioned a white car drove away from the scene.
>
> At trial, [McNiel] testified that he saw [Petitioner], whom he recognized from the neighborhood, shoot and kill Carter and Hodge. The State also presented the testimony of Crystal Roberson, who lived across the street and also knew [Petitioner] from the neighborhood. Ms. Roberson testified that she had seen [Petitioner] break into Carter's automobile and also saw him commit the shootings.
>
> [Petitioner] was eighteen years old at the time of the homicides. Approximately two and one-half months before the incident in question, he was released from prison after serving his sentence for an earlier conviction for second-degree manslaughter.

(*Id.* at 3-4).

At trial, the State produced several witnesses, including Derek Smith, who testified to the events recounted in the Appellate Division's opinion, Lonnie McNiel, Crystal Roberson, Cherese Reese, and several police officers and investigators, one of whom was Investigator Hagel. This Court will only discuss their trial testimony to the extent that that testimony informs the challenges raised by Petitioner here. The first witness whose testimony is subject to a habeas challenge by Petitioner is Crystal Roberson.

At trial, Ms. Roberson testified that at the time of the shooting, she lived at 120 South 12th Street in Newark, New Jersey. (Document 7 attached to ECF No. 15 at 106). At that time, she lived in a third floor apartment in that building. (*Id.* at 106-07). Ms. Roberson testified that, on the night of the shooting, she saw Petitioner steal a car radio from the red Honda Civic involved in the shooting. (*Id.* at 107-08). She further testified that she had known Petitioner for about a

year as she frequently saw him in the neighborhood as he was often at the building across from her home. (*Id.*). Ms. Roberson stated that she saw Petitioner pick up a red club, smash in the window of the Civic, steal the radio, and leave. (*Id.* at 109-10). During this testimony, Ms. Roberson was asked what she did in response, and Ms. Roberson responded by stating "Well, I just said to myself he always stealing things, you know, cause I know him stealing cars." (*Id.* at 111). This statement elicited no objection from defense counsel, indeed, defense counsel used the statement in her closing argument to support the supposition that Roberson identified Petitioner as the thief and shooter because she did not like him and because she believed he was a car thief. (*Id.*; *see also* Document 3 attached to ECF No. 16 at 13-14, 23-24).

Ms. Roberson further testified that, although she went to sleep after witnessing the radio theft, she was awakened by several men walking down the street. (Document 7 attached to ECF no. 15 at 111-12). Ms. Roberson stated that she looked back out the window to see what was going on, and saw three men return to the red Civic, where one began to question Lonnie McNiel about the theft. (*Id.* at 111-16). Ms. Roberson finally testified that, during the argument, she saw Petitioner return, wearing the same clothes as when he stole the radio, and open fire upon the three men, killing two of them while the third ran away. (*Id.* at 117-19).

The next witness to testify whose testimony is subject to habeas challenge here is Lonnie McNiel. McNiel testified at trial that his girlfriend was a resident of 123 South 12th Street, and McNiel went there to visit her on the night of the shooting. (Document 8 attached to ECF No. 15 at 56-57). McNiel stated that, while he was there, he spent some time sitting on the porch of the building with Petitioner and a man called Snap who also lived in the building. (*Id.* at 57). After sitting for a while, McNiel left to visit his girlfriend in her basement apartment. (*Id.* at 57-59).

McNiel ultimately returned to the porch later in the evening, just before Smith and his friends returned to the red Civic. (*Id.* at 63). McNiel testified that he briefly exchanged words with one of the three men, after which Petitioner appeared and began to shoot the three men. (*Id.* at 65). McNiel testified that he then ran into the house towards his girlfriend's apartment to avoid being shot. (*Id.* at 66-68). During his testimony, McNiel also testified that, two weeks before the shooting, he saw Petitioner holding a small black handgun. (*Id.* at 70-72). McNiel further testified that the gun used in the shooting was likewise black, although he could not remember if it was the same weapon. (*Id.* at 72). Defense counsel did not object to this testimony. (*Id.*).

Petitioner also challenges limitations on his counsel's ability to cross-examine Investigator Matthew Hagel of the Essex County Prosecutor's Office. On direct, Hagel testified that he and another investigator processed the crime scene following the shooting in Petitioner's case. (Document 9 attached to ECF No. 15 at 41-42). In that capacity, Hagel took measurements, photographed the scenes and the bodies of Petitioner's victims, and otherwise collected evidence in support of police efforts to find and prosecute the shooter. (*Id.*at 42-45). Hagel also testified that, although he examined the evidence found at the scene for useable fingerprints, no such prints were observed on the evidence he and his co-worker catalogued. (*Id.* at 45-54). Although Hagel did briefly discuss his credentials, he did not appear as an expert witness, and was not qualified as such. (*Id.*).

On cross examination, Defense counsel attempted to discuss with Hagel whether the clothing Petitioner was wearing when he was arrested was processed for the purposes of testing for gun powder residue. (*Id.* at 79-80). The prosecution objected to this line of questioning as it was beyond the scope of direct and because Hagel was not acting as an expert who could testify

as to the efficacy or usefulness of such testing.   (*Id.*).   The trial court upheld the objection, finding that such a line of questioning was far beyond the scope of the direct examination.   (*Id. 79-80,* 86).   Defense counsel was thus not permitted to ask about any residue testing, which by all accounts was not performed in this case.[2]

The testimony Petitioner challenges here is that of witness Cherese Reese.   On Direct, Ms. Reese testified that, at the time of the shooting, she lived on the third floor of 123 South 12th Street. (Document 1 attached to ECF No. 16 at 75).   Ms. Reese testified that she frequently saw Petitioner there as she rented a room to Petitioner's then girlfriend, Tanya Carter.   (*Id.* at 76-77).   Reese further stated that, on September 13th, 1997, several hours before the shooting, she overheard Petitioner and Carter having an argument.   (*Id.* at 77-79).   During the argument, Ms. Reese heard Petitioner say "Bitch, I'll kill you" to Carter, leave, and return with a brown paper bag.   (*Id.* at 82-83).   As Carter tried to leave, Petitioner pulled a gun from the bag showed it to Carter, and told her "she better not come outside," placed the gun back into the bag, and left.   (*Id.* at 84-85).   Ms. Reese attempted to calm Petitioner down by speaking to him outside after he left.   (*Id.* at 85-86). During that conversation, Petitioner told Reese "before this night, before this month was out . . . he swore that he was gonna kill somebody."   (*Id.* at 86).   Petitioner thereafter left.   Reese also testified that she saw Petitioner again later that night, breaking into a red car on the street.   (*Id.* at 87-88).   Defense counsel did not object to this testimony.   (*Id.*).

Following the trial, Petitioner was convicted and sentenced as described above.   Petitioner

---

[2] The trial court likewise prevented defense counsel from questioning the state's ballistics expert, Lt. Prystauk, who testified that three rounds which were recovered from the deceased victims all came from the same .38 caliber handgun, on whether firing a .38 caliber handgun would leave residue on the shooter's hands.   (Document 1 attached to ECF No. 16 at 140-151).

thereafter appealed. On appeal, Petitioner raised four claims: that the testimony of Reese and Roberson amounted to improper other crimes evidence and thus should not have been admitted, or should have resulted in a limiting instruction; that the court's curtailing the cross examination of investigators as to tests not performed violated due process; that the cumulative effect of these errors required a new trial; and that the trial court erred in sentencing Petitioner to consecutive life sentences. (Document 7 attached to ECF No. 13 4-5). The Appellate Division rejected Petitioner's claims as to other crimes evidence as Petitioner had not requested a limiting instruction, and further because Petitioner sought to use the testimony of Roberson on cross to impugn Roberson's credibility. (*Id.* at 6). As to Reese's testimony regarding the threat to kill someone, the Appellate Division found that this evidence did not have the capacity to lead to an unjust result, and as such did not amount to plain error sufficient to warrant reversal. (*Id.*). The trial court likewise found that the limits on cross-examination were within the trial court's discretion, especially in light of the fact that defense counsel "admitted to the court that she had no expert available to testify [regarding] testing for gunpowder residue and the significance of such testing." (*Id.*). The Appellate Division likewise found Petitioner's sentence harsh, but fair, and therefore affirmed. (*Id.* at 6-7). Petitioner petitioned for certification, but his petition was denied. *State v. Thomas*, 167 N.J. 637, 772 A.2d 939 (2001).

Petitioner filed his petition for post-conviction relief (PCR) on April 25, 2001. In his PCR petition, Petitioner raised various arguments, including the following: that the trial court erred in not charging aggravated assault as a lesser included offense of attempted murder, that the jury's verdict was flawed, that trial counsel was ineffective for failing to seek a jury charge including aggravated assault as a lesser included charge of attempted murder, that appellate counsel was

ineffective, that counsel was ineffective for failing to fully develop the argument that the State's failure to conduct gun residue testing raised doubts about Petitioner's guilt, that the late introduction of Ms. Reese prejudice Petitioner, that the state committed a *Brady* violation by failing to disclose criminal charges against Lonnie McNiel under another name (Lonnie Neal), and that counsel was ineffective for failing to locate Petitioner's alleged alibi witness, Vernon Smallwood, prior to trial and subpoena him to testify at trial.[3]   (ECF No. 41 at 5-7).   The first PCR judge rejected all of these claims in a decision issued from the bench.   As to Lonnie McNiel's charges, the PCR judge found no *Brady* violation as there was no evidence that the prosecutors knew Neal and McNiel were the same person, and that there is no requirement that a background check be run on every witness.   (Document 6 attached to ECF No. 16 at 10-12).   The PCR judge likewise rejected any argument about Ms. Reese's testimony as the Appellate Division had rejected claims that her testimony was improper on direct appeal.   (*Id.*at 12).   The PCR judge likewise rejected the argument that counsel was ineffective for failing to develop the gun powder residue argument under the circumstances.   (*Id.*).   Finally, the PCR judge rejected the alibi defense argument, finding that the purported alibi witness had a criminal record, and that he found incredible the assertion that Smallwood visited Petitioner in jail, but Petitioner did not know his last name.   (*Id.* at 13-14).   Finding no merit in Petitioner's arguments, the PCR judge denied the PCR application.   (*Id.* at 14).

Petitioner appealed the denial of his PCR application, raising similar arguments on appeal, but adding claims asserting that an evidentiary hearing should have been held as to the alibi and *Brady* issue prior to a decision on Petitioner's PCR application.   (Document 5 attached to ECF

---

[3] The factual underpinnings of the alibi allegations are discussed in more detail below.

No. 14 at 2-3). Although the Appellate Division found no merit in most of Petitioner's assertions, the Division remanded Petitioner's PCR application for an evidentiary hearing as to the alibi issue. (*Id.* at 3-4).

On remand, the PCR Court[4] held an evidentiary hearing on May 27, 2008. During that hearing, the PCR Court was presented with testimony both as to Petitioner's claim that counsel was ineffective in failing to locate his alibi witness, and on Petitioner's claim that the State committed a *Brady* violation by withholding information as to criminal charges faced by Lonnie McNiel under the name Lonnie Neal. In its opinion upholding the PCR Court's denial of Petitioner's PCR petition on remand, the Appellate Division provided the following summary of the evidence produced at that hearing:

> Janine Beer represented [Petitioner] at his 1998 trial. She testified that [Petitioner] told her "he was at a bar called the Blue Ang[el] Bar sleeping when someone name[d] Raheem woke him up and told him that there had been a shooting outside...." Beer stated that her files note that Raheem lived at 142 or 146 South 10th Street and she had a phone number for him. She also testified that she had a diagram of the area that [Petitioner] helped her draw. This diagram had the name Vernon written on it. She stated that she and her investigator, Dalton Bramwell, spent a lot of time on the case because it was a double homicide and they went to the scene of the shooting many times. Although she did not do any field work on the alibi, she testified that Bramwell went to the bar to speak with the barmaid but was never able to locate Vernon or Raheem, who she learned were the same person.
>
> Having read the statement that Smallwood submitted in 2003, trial counsel stated that she would have used his statement because it was consistent with the defense, if she determined he was a credible witness. She also testified that she did not know that McNeil had a pending charge at the time of the trial or that he had been admitted to the Pretrial Intervention Program (PTI).

[4] A different Superior Court judge oversaw the remand than decided the original PCR petition.

Smallwood testified that at the time of the shooting he was in the Blue Angel Bar on the corner of South 11th Street and Central Avenue. He stated that [Petitioner] arrived at the bar at approximately 12:30 or 1:00 a.m., about an hour-and-a-half or two hours after Smallwood arrived. Although they were not friends, Smallwood knew of [Petitioner] because he was close to [Petitioner's] father. When [Petitioner] arrived at the bar, the two exchanged greetings, and [Petitioner] sat a few seats away from him. There were only seven people in the bar. About forty-five minutes after [Petitioner] arrived, "somebody came running into the door, [and] said some people down the street had got shot...." At that time, [Petitioner] was sitting at the bar talking to some other people. Smallwood and [Petitioner] left the bar and walked toward the scene of the shooting.

Smallwood stated he learned about a week after the shooting that [Petitioner] had been arrested, so he went to speak with [Petitioner's] father. Smallwood testified he told [Petitioner's] father that [Petitioner] was at the bar at the time of the shooting, and he and a couple of people in the bar at the time could verify [Petitioner's] presence there. Smallwood then went to the county jail to see [Petitioner]. He stated he gave [Petitioner] his name so [Petitioner] could call him as a witness. Smallwood testified that he expected someone from the Public Defender's Office or the Prosecutor's Office would contact him, so he did not come forward. He acknowledged he was familiar with the location of these offices from his prior dealings with the criminal justice system. At the hearing, Smallwood could not remember if he lived at 142 or 144 South 10th Street during that time. He later remembered that he lived at 144 South 10th Street, but conceded he gave this address because the prosecutor asked him the question three times.

Smallwood also testified that he gave a statement on January 21, 2003, the first time he spoke with anyone about the shooting. In this statement, he related that [Petitioner] was not drinking when he was at the bar. At the hearing, Smallwood related that he "didn't have [his] eyes on him 24/7 so [he couldn't] say he was definitely not drinking but [he knew] the bartender didn't serve him drinks."

Francis Riley,[] an investigator with the Public Defender's Office, testified that McNeil was arrested under the name Lonnie Neal on June 23, 1997, and was admitted into the PTI program on June 12, 1999. He further testified that McNeil failed to appear for a violation of PTI, and on August 25, 2000, his PTI was terminated.

On September 22, 2000, McNeil was sentenced to three years in state prison after pleading guilty to unlawful possession of a handgun. He could not state when anyone realized Lonnie McNeil and Lonnie Neal were the same person. Riley admitted that he did not obtain any identification, a photograph, or any fingerprints from him. Riley was recalled to testify on the second day of the hearing, and testified that he attempted to subpoena McNeil for the hearing. He agreed that McNeil was being "intentionally deceptive" to avoid appearing in court.

Bramwell, another investigator for the Public Defender's Office, testified that he was assigned to investigate [Petitioner's] case in 1997 and 1998. He noted the investigative request directed him to several witnesses, including a young man named Raheem. He testified that he probably saw the diagram of the house that trial counsel possessed.

Bramwell testified that "the alibi was to find a young man, and go to [a] bar that's on ... Central Avenue, where [Petitioner] was attending a party." Bramwell went there to look for an individual named Raheem. He noted that trial counsel might have given him the name Vernon, but she did not have a last name. Furthermore, trial counsel did not give him an exact address where Bramwell could find this individual. Bramwell went to a multi-dwelling house on South 10th Street, but the only person who answered the door did not know of anyone who fit the description provided by Bramwell. However, he kept ringing the doorbells, left his cards, and asked several other people in the community if they knew this individual. He also spoke to one of [Petitioner's] cousins, who told Bramwell that she would give his card to Raheem.

Bramwell also searched for Raheem at the bar. He testified that he spoke with some of the barmaids. They told him they remembered [Petitioner] being in the bar the day of the party, but that the day of the party was not the day of the shooting. He did not show them a photo of [Petitioner] because the only photo he had was one of [Petitioner] in jail, and he does not "like to show a jail photo of someone because it sends the wrong message." Neither barmaid remembered Raheem.

When Bramwell learned that Vernon was Raheem's real name, he returned to the area, but was unable to speak with anyone at the house on South 10th Street. He noted at the hearing that he is familiar with the convention of using street names in Newark, and

that parents do not always know their children's street names.

(Document 3 attached to ECF No. 14 at 4-8).

Following the hearing, the PCR court denied Petitioner's PCR application by way of a December 22, 2008, written opinion. (Document 8 attached to ECF No. 14). In that written opinion, Judge Casale found the testimony of Petitioner's purported alibi witness, Vernon Smallwood, absolutely incredible:

> Smallwood was not a credible witness. His demeanor and mannerisms were observed by the Court. He was evasive, "shift-eyed," would not look Assistant Prosecutor Cartwright in the eyes when answering questions. He became combative on cross-examination, hesitated upon intense questioning, mockingly smiled and gave strange facial expressions on cross-examination. Yet on direct examination, he smiled at [Petitioner] and was very cooperative with defense counsel. His testimony revealed a bias in favor of [Petitioner], and his extensive criminal record as detailed below further hurts what little credibility he possesses.
>
> . . . .
>
> As far as criminal record, Smallwood had some difficulty with his recollection. He couldn't recall how many convictions he had, and the years of his convictions. When confronted with his [criminal history report], he finally admitted he was convicted of 3rd degree terroristic threats in 1990, and then in 1996, he was convicted of endangering the welfare of a child and 3rd degree unlawful possession of a weapon. There was a probation bench warrant out for his arrest after 2000.
>
> . . . .
>
> There were inconsistencies between Smallwood's version and [Petitioner's] testimony at his *Miranda* hearing. Smallwood said [Petitioner] didn't drink – [Petitioner] testified that he did cognac shots and drugs on the night in question. [Petitioner] claims he was sleeping at the time he was told of the shooting – Smallwood said they were talking. Smallwood's supposed recollections of the timeframe of [Petitioner]'s presence in the Blue Angel directly contradicted [Petitioner]'s sworn testimony at his *Miranda* hearing.

> [Petitioner] testified at his *Miranda* [hearing] that while he was in the Blue Angel there was an "after party," while Smallwood's statement and testimony does not mention any such party.
>
> It is not believable that neither Smallwood nor [Petitioner] ever left their seats the entire time they were in the bar. Nobody went to the bathroom? Nobody got up to talk to other bar patrons? [Petitioner] and Smallwood just sat three seats away from each other, talking and staring at each other.
>
> Smallwood is definitely a biased witness and a jury would view him as such. He has known [Petitioner] and [Petitioner]'s father for a very long time. He is from [Petitioner]'s neighborhood, and shares his anti-police mentality. He knew [Petitioner] was away for 2 ½ years on a prior homicide, and he knew that [Petitioner] was immediately arrested for this crime. Smallwood knew [Petitioner] was at Essex County Jail and visited him one week after the shooting. Smallwood knew the system – he knew where the courthouse was, he knew where the prosecutor was and the public defender's office [was]. He had 3 prior indictable convictions by 1997, yet he didn't come forward until 2003!
>
> It is thus fortunate that defense counsel never located Smallwood before trial. [Petitioner's trial counsel] testified she would not have put him on the stand until she assessed his credibility and his criminal record. Both factors are poor, and if Smallwood did testify for [Petitioner] with his baggage, it may very well have backfired on [Petitioner].

(*Id.* at 4-5, 8-9).

In contrast, Judge Casale found both Petitioner's trial counsel and the investigator who assisted her in attempting to find Petitioner's alibi witness both credible and competent. (*Id.* at 3, 6-7). Judge Casale therefore found that Petitioner had received constitutionally effective counsel, and made the following factual findings which support that conclusion:

> [a]n examination of [*Strickland v. Washington*, 466 U.S. 668 (1984) and related state court] case law in light of the facts of [this] case, and Smallwood's testimony[,] clearly reveals that the efforts of trial counsel and her investigator fall well within any valid definition of "reasonable professional assistance." Furthermore, even if

> Smallwood was located he probably would not have been used, and his testimony is so biased and incredible it would not have changed the result [of Petitioner's trial].
>
> Based upon the testimony of [trial counsel and her investigator], whatever information was given by [Petitioner] was properly followed up by them. [The investigator's] efforts were constrained by the quality of [Petitioner]'s information. It is unclear whether [Petitioner] identified "Raheem" as "Vernon." It is unclear whether he gave the proper address. Even Smallwood didn't know his own proper address. [The investigator] was familiar with the area and the people located therein. He visited the area numerous times. He spoke to the barmaids at the Blue Angel, [Petitioner]'s family members, interviewed the residents of the neighborhood. He went to the addresses provided by Raheem and [Petitioner]. Despite these efforts, which were substantial ("it was a homicide"), [the investigator] was unable to corroborate [Petitioner]'s alibi, other than to confirm he did frequent the Blue Angel Lounge, and was [at] a party there with Smallwood the night before the shootings.
>
> The Court finds there has been no showing of ineffective assistance of counsel on this issue and therefore, [Petitioner] has failed to meet the requirements of the first prong of [*Strickland* and its state court progeny].

(*Id.* at 8).

Although beyond the scope of the Appellate Division's remand, Judge Casale also addressed Petitioner's arguments that his alibi witness constituted "newly discovered evidence", that counsel was ineffective in failing to press the gun powder residue issue, and that the state had committed a *Brady* violation. As to newly discovered evidence, Judge Casale rejected Petitioner's arguments as the reason Smallwood was not produced was because Petitioner and his family failed to provide adequate information necessary to contact Smallwood, and because, in any event, Smallwood's testimony would not have likely changed the verdict at trial. (*Id.* at 9). Judge Casale likewise rejected the claim that counsel was ineffective for failing to press the residue

issue as Petitioner had failed to provide any case law which would permit the trial court to give an adverse inference charge based on the state's "failure" to do gun powder residue testing, and Petitioner was therefore effectively claiming that counsel was ineffective in failing to take actions that had never been attempted before in New Jersey.   (*Id.* at 9-10).

Judge Casale finally addressed Petitioner's *Brady* argument.   Although he felt hat this was Petitioner's "best" argument, the PCR judge rejected the argument as Petitioner had provided no evidence that the assistant prosecutor involved in his case was aware of any charges against Lonnie McNiel; Petitioner had failed to establish that the individual subject to the charges actually *was* Lonnie McNiel; because the charged individual ultimately spent several years in jail and there was no evidence that even were he McNiel, that individual received any bargain in exchange for his testimony; because the overwhelming evidence at trial would have produced the same verdict even without McNiel's testimony; and because this argument was improperly raised in a PCR petition rather than on direct appeal.   (*Id.* at 10-11).   As he had rejected all of Petitioner's arguments, Judge Casale denied Petitioner's PCR application.   (*Id.*).

Following the December 2008 opinion, Petitioner filed both an appeal and an out of time motion for reconsideration.   (Document 9 attached to ECF No. 16 at 6-11).   The matter was again remanded so that Judge Casale could consider the reconsideration motion, which provided further evidence that Lonnie Neal was, in fact, Lonnie McNiel, in support of Petitioner's *Brady* claim. (*Id.*).   Although Judge Casale found that the motion was procedurally barred, he did briefly address the merits of the motion, and found that denial was required on the substance as well as the procedure of the motion.   (*Id.*).   Judge Casale found that, even given that Lonnie Neal and McNiel are the same person, the evidence of Petitioner's guilt was overwhelming and the verdict

would not change without McNiel's testimony. (*Id.* at 11-12). Judge Casale likewise found no evidence to support that the state had made any deal with McNiel, especially given his reluctance to testify at trial. (*Id.*).

Petitioner thereafter appealed again, and the Appellate Division affirmed Judge Casale's denial of PCR and of reconsideration on May 18, 2011. (Document 3 attached to ECF No. 15). In so doing, the Appellate Division held as follows:

> [w]e discern no basis to disturb the disposition of this petition. Judge Casale had the opportunity to hear the testimony of the key witnesses regarding the purported alibi defense, including the alibi witness. Not only did he find the alibi witness not credible, he also found the trial attorney and the two investigators credible witnesses. The judge specifically noted the inconsistencies between the testimony of [Petitioner] and his alibi witness about events at the bar on the evening of the shooting, and recognized the "baggage" the alibi witness carried as a witness. The judge accepted the trial attorney's testimony that she would have evaluated his credibility and the risks posed to the defense, if he had been located before or during trial. His familiarity with [Petitioner] and his family, his serious criminal record, and the inconsistencies between the version of events offered by [Petitioner] and Smallwood counseled against using him as a witness.
>
> In addition, [Petitioner] did not establish a need for an evidentiary hearing on the issue of the prosecutor's knowledge of the criminal charges against McNeil. Nor did [Petitioner] establish as a matter of law that the failure of the prosecutor to reveal the charges denied [Petitioner] due process of law and requires a new trial.
>
> In [*Brady v. Maryland*, 373 U.S. 83, 87 (1963)], the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Our Supreme Court has noted there are three elements to a Brady violation: "The evidence must be favorable to the accused; it must be suppressed by the prosecution; and it must be material." *State v. Nelson*, 155 N.J. 487, 497[, 715 A.2d 281, 286] (1998) [(citing *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972))], *cert. denied*, 525 U.S. 1114 [(1999)].

> . . . .
>
> Although beyond the scope of the remand ordered by this court, Judge Casale addressed the issue, and we will do so also. First, we are reluctant to impute knowledge to the assistant prosecutor, who tried this case in 1998, of the charges pending against McNeil. Our review of his June 1998 testimony reveals no suggestion that either the prosecutor or defense counsel knew that McNeil used another name. Both counsel addressed him as Mr. McNeil; neither inquired whether he used another name. McNeil did not disclose he used another name. He responded to a subpoena directed to and served on Lonnie McNeil. The fact that it is not apparent from the record that the assistant prosecutor knew that McNeil used another name counsels against imputing knowledge of the pending charges under the name Lonnie Neal. Moreover, the record is bereft of any information to suggest that the assistant prosecutor should have known of the charges.
>
> Furthermore, the state of the trial evidence in support of the verdict is such that there is not a reasonable probability that disclosure of the pending charges and his PTI admission to the jury would have so damaged his credibility that the verdict would be undermined. McNeil was a reluctant witness. He testified that he was afraid of the police. He never spoke to either the police or anyone from the prosecutor's office until about a week before the trial and then only in response to a subpoena. In short, he did not present himself as a witness eager to help the State obtain a conviction and secure any benefit to himself.
>
> Finally, [Petitioner]'s argument that discovery of the alibi witness and the impeachment evidence is newly discovered evidence that warrants a new trial is without sufficient merit to warrant further discussion in this opinion. R. 2:11–3(e)(2).

(*Id.* at 16-20).

Following the Appellate Division's affirmance, Petitioner file a petition for certification, which was denied by the New Jersey Supreme Court on November 18, 2011. *State v. Thomas*, 208 N.J. 599, 34 A.3d 781 (2011). Petitioner thereafter filed his initial habeas petition on or about April 2, 2012. (ECF No. 1). This Court dismissed that petition on January 25, 2013, as it was a

mixed petition containing both exhausted and unexhausted claims. (ECF No. 22, 23). Following a motion for reconsideration filed by Petitioner (ECF No. 25), this Court reopened this matter and permitted Petitioner to file an amended petition containing only his exhausted claims on September 4, 2013. (ECF No. 33). Petitioner thereafter filed this amended habeas petition on October 25, 2013. (ECF No. 35). On August 21, 2014, Petitioner filed a motion for an evidentiary hearing, which this Court denied on February 13, 2015. (ECF No. 46, 55).

## II. DISCUSSION

### A. Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, 132 S. Ct. 2148, 2151 (2012). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 125 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

**B. Analysis**

**1. Petitioner's claim that the trial court improperly admitted prior bad act testimony**

Petitioner first argues that the state trial court erred by admitting the testimony of Roberson, Reese, and McNiel because that testimony included prior bad acts which were not admissible. Specifically, Petitioner challenges Roberson's statement that he was "always stealing things" including cars, Reese's testimony that he stated an intent to kill someone before the month was out on the day of the shooting, and McNiel's testimony that Petitioner had a small black handgun a few weeks before the shooting.[5] As Petitioner in essence challenges the state court's admission

---

[5] Respondents argue that Petitioner's claims regarding McNiel were never previously raised and

of evidence, his claims face a high bar. "[T]he Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules." *Marshall v. Lonberger*, 459 U.S. 422, 438 (1983). As a result, the admissibility of evidence is generally a state law question which is not cognizable as a habeas claim. *See Keller v. Larkins*, 251 F.3d 408, 416 n. 2 (3d Cir. 2001) ("A federal habeas court . . . cannot decide whether the evidence in question was properly allowed under the state law of evidence"). A criminal defendant's Due Process rights would only be impugned if he was deprived of the "fundamental elements of fairness in [his] criminal trial." *Glenn v. Wynder*, 743 F.3d 402, 407 (3d Cir. 2014) (alteration in original). "The Supreme Court has 'defined the category of infractions that violate 'fundamental fairness' very narrowly, based on the recognition that, beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.'" *Id.* (quoting *Medina v. California*, 505 U.S. 437, 443 (1992)). "In order to satisfy due process, [Petitioner's] trial must have been fair, it need not have been perfect." *Id.* (citing *United States v. Hasting*, 461 U.S. 499, 508 (1983)). Thus, a Due Process violation occurs in the context of an evidentiary decision only when that ruling was "so arbitrary or prejudicial that it rendered the trial fundamentally unfair." *Scott v. Bartkowski*, No. 11-3365, 2013 WL 4537651, at *9 (D.N.J. Aug. 27, 2013) (citing *Romano v. Oklahoma*, 512 U.S. 1, 12-13 (1994)).

Petitioner first argues that the statement of Roberson that he was "always stealing things" and that Petitioner was known to be a car thief essentially amounts to prior bad act testimony.

---

thus constitute an unexhausted claim which would normally require the dismissal of Petitioner's petition without prejudice. Because this Court rejects Petitioner's claim about McNiel's testimony on the merits, however, the petition need not be dismissed as unexhausted. *See* 28 U.S.C. § 2254(b)(2).

Under Rule 404(b) and its state court equivalents, evidence of prior bad acts are generally inadmissible to show a propensity to act in conformity therewith, but are admissible when those acts have a proper evidentiary purpose and a sufficient limiting instruction is given where requested. *See, e.g., United States v. Green*, 617 F.3d 233, 249-50 (3d Cir. 2010); *State v. Cofield*, 127 N.J. 328, 605 A.2d 230 (1992). Claims of error in admitting such testimony, however, are subject to harmless error analysis, and, as such, where it is highly probable that the alleged prior bad act testimony did not contribute to the verdict, such as where the evidence of guilt is overwhelming, the admission of that testimony would be insufficient to warrant relief even on the lower standard of review applicable to direct appeals. *See, e.g., United States v. Ali*, 493 F.3d 387, 392 n.3 (3d Cir. 2007).

Roberson's testimony that Petitioner was "always stealing things," including cars, was a single statement which was not responsive to the question asked and was not focused on by the state at trial. Instead, that statement became a lynchpin in Petitioner's attacks on Roberson's credibility which allowed Petitioner to repeatedly argue that her testimony was the result of personal animus or dislike towards Petitioner and that she was therefore biased. Given the overwhelming evidence produced against Petitioner, including the testimony of three eyewitnesses to the shooting, the fleeting nature of the comment, and Petitioner's use and reuse of the statement, Roberson's comment appears to have been entirely harmless. The record therefore establishes that it is highly probable that the comment had no effect on the outcome of Petitioner's trial, and if anything actually aided Petitioner by providing him a basis to attack the credibility of an eyewitness. The admission of this statement, to which Petitioner did not object and which he used to his benefit, was not arbitrary and was ultimately harmless. The state courts therefore did not

deny Petitioner fundamental fairness, nor impugn Petitioner's due process rights.   Roberson's statement therefore is insufficient to establish a basis for habeas relief.

Petitioner next attacks the testimony of Reese, who testified that Petitioner told her he was going to kill someone before the night and month were out on the day of the shooting.   The Appellate Division concluded that this testimony, in the light of the overwhelming evidence against Petitioner, was incapable of producing and unjust result and constituted, at best, harmless error.   (*See* Document 7 attached to ECF No. 13 at 6).   This Court agrees that, in light of the overwhelming evidence of Petitioner's guilt produced at trial, that this statement by Reese lacked the capacity to impugn the fundamental fairness of Petitioner's trial, and was therefore harmless. *Scott,* 2013 WL 4537651 at *9.   As such, the Appellate Division's conclusions were not based on an unreasonable determination of the facts or law, and Petitioner is not entitled to habeas relief on this claim.

Petitioner next turns to the testimony of Lonnie McNiel and argues that the trial court should not have admitted his testimony that Petitioner possessed a small black handgun which he showed McNiel a few weeks before the shootings.   The problem with that argument, however, is that Petitioner was charged with several crimes related to gun possession.   Thus the question of whether Petitioner possessed such a weapon was clearly at issue in the trial, and McNiel's testimony was therefore not related to a prior bad act, but rather to Petitioner's possession of a weapon.   In any event, it is clear that such evidence would have been admissible under state law at any rate. *See, e.g., State v. Jenkins*, 793 A.2d 861, 870 (N.J. App. Div. 2002), *certif. denied*, 174 N.J 43, 803 A.2d 638 (2002).   Under the circumstances, and especially in light of the significant evidence presented as to Petitioner's guilt, the admission of McNiel's testimony

regarding the gun was not capable of denying Petitioner a fundamentally fair trial, and as such Petitioner is not entitled to habeas relief on this ground. *Scott,* 2013 WL 4537651 at *9.

**2. Petitioner's claim that the trial court improperly limited cross examination as to gun powder residue tests**

Petitioner next argues that the trial court erred by refusing to permit defense counsel to question two state witnesses regarding the "failure" of the state to conduct gun powder residue testing on Petitioner following his arrest. The Confrontation Clause of the Sixth Amendment, applicable to the states through the Due Process Clause of the Fourteenth Amendment, guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI. This right to confrontation includes the right to cross-examine those witnesses. *Vreeland v. Warren*, No. 11-5239, 2013 WL 1867043, at *14 (D.N.J. May 2, 2013); *see also Smith v. Illinois*, 390 U.S. 129, 131 (1968). This right, however is not without its limits:

> "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 [(1985)]. Thus, the scope of cross-examination regarding a particular line of inquiry falls necessarily "within the sound discretion of the trial court," and "it may exercise a reasonable judgment in determining when [a] subject is [inappropriate]." *Alford* [*v. United States*, 282 U.S. [687, 694 (1931)]. "[T]rial judges retain wide latitude ... to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 [(1986)].

*Vreeland*, 2013 WL 1867043 at *15. Both the New Jersey and Federal Rules of Evidence

likewise establish that the scope of cross-examination should generally be limited to the subject matter raised in direct examination and issues affecting the credibility of the witness, and that scope may only be expanded where the trial court so permits in its discretion. *See* N.J.R.E. 611(b); Fed. R. Evid. 611(b).

Petitioner argues that it was improper for the trial judge to prevent his attorney from cross examining two witnesses, Hagel and Prystauk, on the question of whether a gun powder residue test had been conducted when Petitioner was arrested. Neither witness testified regarding that subject on direct, with Hagel detailing what evidence was collected from the scene and Prystauk discussing the fact that the bullets recovered from the deceased victims all came from the same gun. Neither testified to performing any tests on Plaintiff himself, nor did either discuss gun powder residue testing in any way, shape, or form. The Defense had no expert to offer an opinion that such testing should have been done, and nothing in the record indicates that such testing was performed. (*See* Document 7 attached to ECF No. 13 at 6). As such, counsel's attempt at cross examination addressed issues beyond the scope of direct which were, at best, marginally relevant and had the ability to confuse a jury by bringing up testing which was not done without any context. The trial court's refusal to permit that line of questioning on cross examination was therefore well within its discretion. As the decisions of the state court on this issue were therefore not an unreasonable application of either the law or the facts at hand, Petitioner is not entitled to habeas relief on this basis.

### 3. Petitioner's Ineffective Assistance of Counsel Claims

Petitioner next raises several arguments to suggest that his counsel was constitutionally

ineffective. The standard for evaluating ineffective assistance of counsel claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687*; see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.
>
> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.
>
> Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned

> legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, No. 13-2896, 2015 WL 4742380, at *3-4 (D.N.J. 2015).

Defendant first argues that his trial counsel was ineffective in failing to request that the trial court charge aggravated assault as a lesser-included offense of attempted murder rather than as a stand-alone indicted charge. Even if counsel's alleged failure were sufficient to support an ineffective assistance of counsel claim, and N.J. Stat. Ann. § 2C:1-8 suggests that it was not, Petitioner's claim must fail because he cannot show that he was prejudiced. Although aggravated assault was not explained to the jury as a lesser included offense of attempted murder, the jury was provided an aggravated assault charge as a stand-alone indicted offense. Indeed, the jury found Petitioner guilty of both attempted murder and aggravated assault. The jury was therefore provided the opportunity to reject the state's evidence as to attempted murder and instead find guilt only as to aggravated assault, and chose not to do so given the overwhelming evidence of Petitioner's guilt. As aggravated assault was merged into attempted murder at sentencing, Petitioner received no extra punishment as a result of the separate charging. The record, then, clearly shows that Petitioner received the benefit of aggravated assault as an alternative to attempted murder, and suffered no greater penalty as a result of the jury charge. Petitioner was therefore not prejudiced, and there is nothing in the record to suggest that the charge itself was so flawed that it would warrant habeas relief. *See Duncan v. Morton*, 256 F.3d 189, 203 (3d Cir.

2001) ("the Supreme Court has stated that the fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief" an instruction must by itself "so infect[] the entire trial that the resulting conviction violates due process"), *cert denied*, 534 U.S. 919 (2001).   As Petitioner suffered no prejudice as a result of counsel's "failure" to request that aggravated assault be charged as a lesser included offense of attempted murder, he has failed to show ineffective assistance of counsel.

Petitioner next asserts that counsel was ineffective in failing to move to dismiss the aggravated assault charge as a stand-alone offense, relying on his argument that it should instead have been charged as a lesser included offense.   As with his underlying argument, Petitioner can show no prejudice resulted as he received the benefit of presenting the jury with both charges as options, and suffered no additional sentence as a result of the merger of his aggravated assault charge with the attempted murder charge.   As such, this argument, too, fails to establish ineffective assistance of counsel.[6]

Petitioner next reaches his chief argument in support of his petition: that trial counsel was ineffective for failing to locate and subpoena his alibi witness, Vernon Smallwood.   *Strickland* requires that "[c]ounsel . . . make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.   In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a

---

[6] Petitioner does not appear to be arguing that counsel failed to move to dismiss the stand-alone aggravated assault charge on insufficiency of evidence.   The record is clear, however, that counsel made such a motion, and in any event, there was more than sufficient evidence presented to maintain the charges given the multiple eye-witnesses who testified at trial.   (*See* Document 2 attached to ECF No. 16 at 17-18).   Thus, if Petitioner did intend to make such a claim, it would fail for lack of prejudice as well.

heavy measure of deference to counsel's judgments." *Gregg v. Rockview*, 596 F. App'x 72, 77 (3d Cir. 2015) (quoting *Strickland*, 466 U.S. at 691).   This Court agrees with Judge Casale of the PCR court that Petitioner has failed to show that counsel and her investigator were deficient in their investigation and that he suffered any prejudice as a result of their failure to find Vernon Smallwood.

Petitioner's claim of ineffective assistance of counsel is essentially that counsel should have been able to find Vernon Smallwood based on the information he provided, and should therefore have had Smallwood provide alibi testimony at Petitioner's trial.   The flaw in that argument, as the trial court noted, is that the testimony during the PCR hearing clearly established that counsel and her investigator diligently sought to locate and interview Petitioner's alibi witness. The record indicates that Petitioner told counsel that a "Raheem" who may also have been called "Vernon" was with him the night of the shooting and could provide him with an alibi witness. Petitioner provided counsel with a diagram of the area and a rough idea of where to locate "Raheem."   Counsel thereafter dispatched her investigator who sought out "Raheem" to the best of his ability, but was able to locate no one who could provide a location for him.   The investigator also discussed the matter of "Raheem" with Petitioner's family, who said that they would pass his card on to Smallwood.   Smallwood, however, never contacted the investigator.   When Smallwood's full name became known to defense counsel, the investigator returned to the neighborhood and searched for him to no avail.   That Smallwood could not be located is not surprising, given that Smallwood himself was uncertain where he lived at the time.   What all of this indicates is that counsel and her investigator diligently sought after but were ultimately unable to find Smallwood, and what information they did find actively contradicted Petitioner's alleged

alibi (in so much as the investigator found witnesses who said that the party Petitioner claimed occurred the night of the shooting actually occurred the night *before*).   Thus, the facts fully support Judge Casale's conclusion that counsel was not deficient in attempting to find Petitioner's alibi witness.   As Judge Casale's conclusion, as upheld by the Appellate Division, is fully supported by the evidence, and is therefore not based on an unreasonable application of the facts or law at issue, Petitioner's ineffective assistance of counsel claim must fail.   28 U.S.C. § 2254(d)(1)-(2).

This conclusion is further supported by the fact that Petitioner failed to show that he suffered any prejudice as a result of not receiving the benefit of Smallwood's testimony.   Judge Casale, following the PCR hearing, concluded that Smallwood would have provided no benefit to Petitioner, and may actually have hurt his case.   The facts evinced at the hearing fully support that finding.   At the hearing, Smallwood's testimony was frequently inconsistent, including as to mundane matters such as his own home address at the time in question.   His testimony likewise suffered from basic incredibility in so much as Smallwood knew that Petitioner had been charged, knew where to find defense counsel and the prosecutor, and allegedly told Petitioner he'd testify for him, but then took no steps to make that happen and did not appear for those purposes until he was found by Petitioner's PCR counsel five years after Petitioner's conviction.   The PCR judge's perception of Smallwood further suggests that he would have been a poor witness in so much as he presented an obvious bias: Judge Casale describes him as "shift-eyed," combative on cross examination, and clearly showing an anti-police and pro-Petitioner bias which would have hurt his credibility before a jury.   Combined with the incredible nature of Smallwood's testimony: that he sat three stools from Petitioner and neither of them moved all night, this bias would surely have

rendered his testimony of little value to a jury who had already heard from three eyewitnesses. That Smallwood also had multiple convictions for indictable offenses further reduced any value he would have had to Petitioner's case. Ultimately, given the overwhelming evidence of Petitioner's guilt, including multiple eye witnesses, two of whom were familiar with Petitioner beforehand, given Smallwood's history, and given Smallwood's lack of credibility based on both his demeanor and his inconsistent testimony, the record fully supports Judge Casale's conclusion that Petitioner was not prejudiced by counsel's "failure" to call Smallwood as an alibi witness. Thus, Judge Casale's conclusion, affirmed by the Appellate Division, was not based on an unreasonable determination of the facts, and fully comported with the *Strickland* line of cases, and thus Petitioner is not entitled to habeas relief on this claim even without considering the fact that Smallwood's testimony directly contradicted Petitioner's version of events as provided during his *Miranda* hearing.

Petitioner attempts to argue, however, that because Smallwood could not have been cross-examined on the basis of Petitioner's "forced" testimony at the *Miranda* hearing, that the PCR court's conclusion that Petitioner suffered no prejudice was unreasonable. As this Court has already concluded that Petitioner has failed to show that he was prejudiced even in the absence of the contradictions presented between the two versions of events, this argument is of no moment here. In any event, Petitioner's argument misses the point. The contradictions were important for two reasons: first, Petitioner himself argued that their consistency supported a finding that the alibi defense had merit to the PCR court, and, more importantly, his trial counsel testified that she would only have called Smallwood if his testimony was credible. As Smallwood's testimony directly contradicted Petitioner's *Miranda* hearing testimony (Smallwood claiming only a few

were in the bar and that Petitioner was awake and aware, whereas Petitioner testified he was at a party and fell asleep due to drink and drugs he imbibed), the credibility of those statements certainly would have been suspect to defense counsel had she been provided with Smallwood's purported testimony. Thus, those contradictions were properly before the PCR court even if they could not have been used at trial as Petitioner asserts. Those contradictions therefore present further support for a lack of prejudice. Ultimately, however, that support is unnecessary. Even disregarding the contradictions between Petitioner's testimony and Smallwood's, Petitioner has failed to show that counsel was deficient and that he was prejudiced by that alleged deficiency. As such, his ineffective assistance claim fails on both prongs of the *Strickland* test. Judge Casale's rejection of Petitioner's alibi argument is therefore fully supported by the evidence presented at the PCR hearing and fully comports with Supreme Court caselaw, and as such Petitioner is not entitled to habeas relief. *See* 28 U.S.C. § 2254(d)(1)-(2), (e)(1); *see also Strickland*, 466 U.S. at 689-91.

**4. Petitioner's *Brady* claim**

Petitioner next argues that he is entitled to habeas relief on the basis that he was not provided with information regarding Lonnie McNiel's criminal charges under the name Lonnie Neal. A violation of a petitioner's Due Process rights occurs under *Brady v. Maryland*, 373 U.S. 83 (1963) if "(1) the evidence at issue is favorable to the accused, because either it is exculpatory or impeaching; (2) the prosecution withheld it, and (3) the defendant was prejudiced because the evidence was 'material.'" *Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011). Evidence is material if there is "a reasonable probability that, if the evidence had been disclosed, the result of

the proceeding would have been different." *Wilson v. Beard*, 589 F.3d 651, 665 (3d Cir. 2009) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)). "[T]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

A question of central importance to Petitioner's *Brady* claim is whether the prosecutor in his criminal matter actually possessed the information he claims was withheld: knowledge of the criminal charges pending against Lonnie McNiel under the name Lonnie Neal. "The law is clear that the prosecution must not 'withhold' impeachment evidence. It is equally clear that the government is only 'obligated to produce certain evidence actually or constructively in its possession or accessible to it.'" *Hollman v. Wilson*, 158 F.3d 177, 180 (3d Cir. 1998) (quoting *United States v. Perdomo*, 929 F.2d 967, 970 (3d Cir. 1991)). "Where the prosecutor had no actual or constructive possession of information, there can be no *Brady* violation for failure to disclose it." *Id.*

Petitioner's *Brady* claim fails for the two reasons expressed by the Appellate Division during his PCR proceedings: first, there is insufficient evidence to show that the prosecution knew of the charges against McNiel and thus actually or constructively possessed the information Petitioner alleges was not disclosed, and second, the information was not material. The evidence presented to the PCR court, both on remand and in the motion for reconsideration, showed that although Lonnie McNiel was, in fact, the Lonnie Neal who was arrested on certain charges which

were pending at the time of Petitioner's trial, charges which initially netted Neal PTI but ultimately resulted in him serving a three year prison sentence, neither the state nor Petitioner were aware of the fact that the two were one and the same. The charges against the witness were all under the name Lonnie Neal, rather than McNiel, and McNiel responded to a subpoena addressed to him under the name Lonnie McNiel, the name under which he ultimately testified. Given the ultimate result of McNiel's charges, PTI and ultimately three years' imprisonment, the PCR court's conclusion that the evidence does not suggest that any bargain existed between McNiel and prosecutor's was entirely reasonable under the circumstances. The factual determinations that the prosecutors had no reason to conclude the two individuals were the same, and no reason to suspect that McNiel was subject to charges under a different name were similarly supported by the evidence and therefore were not an unreasonable application of the facts under the circumstances. Indeed, nothing in the record suggests anyone involved in Petitioner's case had any reason to believe that Lonnie McNiel used another name at all. As there was therefore no basis for concluding that the prosecutor possessed either actual or constructive knowledge of McNiel's criminal charges, it was not an unreasonable application of law or facts for the state courts to determine that no suppression occurred as the state did not possess the information Petitioner alleges was suppressed. *Hollman*, 158 F.3d at 180.

Petitioner's *Brady* claim would also fail because the charges were not material. The conclusion of the Appellate Division, that the impeachment value of the charges would have been minimal given McNiel's status as a reluctant witness, his fear of the police, and his reticence to testify prior to being subpoenaed was entirely reasonable, especially given the testimony of the other eye witnesses which supports McNiel's version of events. There is therefore not a

reasonable probability that the result of Petitioner's trial would have been different had the charges come to light. The significant evidence against Petitioner provides this Court with no basis to doubt that the verdict in this case is worthy of this Court's complete confidence. As such, the information Petitioner alleges was suppressed is immaterial, and no *Brady* violation can be said to have occurred as a result. *Breakiron*, 642 F.3d at 133. The state courts' rulings were therefore neither an unreasonable application of the law or facts, and Petitioner is not entitled to habeas relief.

**5. Petitioner's Cumulative Arguments**

In his final pair of arguments, Petitioner asserts that the cumulative effect of the "errors" discussed in Points one and two, as well as the cumulative effect of the "errors" discussed in Points three and four, cumulatively warrant habeas relief. The Third Circuit has recognized that "errors that individually do not warrant habeas relief may do so when combined." *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007), *cert. denied*, 552 U.S. 1108 (2008). As the Third Circuit explained,

> The standard for evaluating harmless error on collateral review is set forth in *Brecht v. Abrahamson*, 507 U.S. 619 [(1993)]. This is the standard applicable here, because "a cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Darks v. Mullin*, 327 F.3d 1001, 1018 (10th Cir. 2003). Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish "actual prejudice." *Brecht*, 507 U.S. at 637[; *see also*] *Whitney* [*v. Horn*], 280 F.3d [240,] 258–59 & n.18 [(3d Cir. 2002)] (Strickland prejudice and Brecht harmless error are essentially same standard).

*Albrecht*, 485 F.3d at 139.

Although Petitioner argues that his claims cumulatively show that he was denied the benefit of Due Process, such an argument is without merit. This Court has reviewed his claims and either found that no error occurred, or that any error which occurred produced no prejudice and lacked the capacity to render his criminal trial fundamentally unfair. Those alleged errors viewed in the aggregate fair no better. Given the amount of evidence produced at trial, which the state courts have described as "overwhelming" (*see, e.g.*, Document 7 attached to ECF No. 13 at 6), this Court concludes that the alleged errors raised by Petitioner, for the reasons recounted individually above, lacked the capacity to have a substantial and injurious effect upon Petitioner's trial either individually or taken together, and as such Petitioner was not denied Due Process of Law. *Albrecht*, 485 F.3d at 139. Petitioner has failed to establish that he suffered actual prejudice capable of producing an unjust result as a result of the alleged errors he raises in his habeas petition, and, as such, he has failed to show his entitlement to relief on the basis of cumulative error. *Id.* This Court will therefore deny Petitioner's habeas petition in its entirety.

## III. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of a state court proceeding unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution

of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). For the reasons expressed above, Petitioner has failed to make a substantial showing that he was denied a constitutional right as jurists of reason could not disagree with this Court's resolution of his claims and he has not shown that the issues presented here are adequate to deserve encouragement to proceed further. This Court shall therefore deny Petitioner a certificate of appealability.

**IV. CONCLUSION**

For the reasons stated above, Petitioner's petition for a writ of habeas corpus is DENIED, and Petitioner is DENIED a certificate of appealability. An appropriate order follows.

Hon. Jose L. Linares,
United States District Judge